RECEIVED

JUL 11 2008

U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

ONBOARD LLC,

                                        Plaintiff,

               – against –

PROPERTYMAPS, INC.

                                  Defendant.

------------------------------------------------------------------------ X

Case No. 08 civ 5449 (AKH)

ECF Case

**AMENDED
VERIFIED COMPLAINT**

**Jury Trial Demanded**

      Plaintiff OnBoard LLC ("Plaintiff" or "On Board"), by its undersigned attorneys, the Law

Offices of David C. Berg, as and for its Amended Verified Complaint against defendant

PropertyMaps, Inc. ("Defendant" or "PropertyMaps") herein allege as follows:

### THE PARTIES

      1.     Plaintiff OnBoard is a limited liability company organized under the laws of the

State of New York with its principal place of business located at 90 Broad Street, Suite 2001,

New York, New York 10004.

      2.     Upon information and belief, Defendant PropertyMaps is a corporation organized

under the laws of the State of Florida with its principal place of business located at 325 Interstate

Boulevard, Sarasota, Florida 34240.

      3.     Upon information and belief, Defendant provides services to consumers

throughout the country, including within the State of New York and in this judicial district,

through their website at www.propertymaps.com.

## JURISDICTION AND VENUE

4.      This is a civil action for common law misappropriation of trade secrets and unfair competition.

5.      This action seeks to address irreparable harm to Plaintiff's business and damages incurred by Plaintiff as a result of Defendant misappropriating Plaintiff's trade secrets and unfairly competing with Plaintiff by using such trade secrets for its own business.

6.      Plaintiff's business has been damaged throughout the country, including in the State of New York, as a result of Defendant's misappropriation and unfair competition.

7.      This action seeks damages and injunctive relief.

8.      This Court thus has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) since there is complete diversity among the parties and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.      Upon information and belief, Defendant transacts business within the State of New York.

10.     Upon information and belief, Defendant contracts to supply services within the State of New York.

11.     Upon information and belief, Defendant regularly does or solicits business, or engages in other persistent courses of conduct within the State of New York.

12.     Upon information and belief, Defendant derives substantial revenue from goods used or consumed in the State of New York.

13.    Defendant expects or should reasonably expect its misappropriation of Plaintiff's trade secrets, and unfair competition therewith, to have consequences in the State of New York.

14.    Upon information and belief, Defendant derives substantial revenue from interstate commerce.

15.    Upon information and belief, Defendant has committed tortious acts outside the State of New York that have caused damage within the State of New York.

16.    The Court has personal jurisdiction over the Defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure and New York Civil Practice Laws and Rules ("NY CPLR") § 301, NY CPLR § 302(a)(1), NY CPLR § 302 (a)(2), NY CPLR § 302 (a)(3)(i) and NY CPLR § 302 (a)(3)(ii).

17.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events and/or property giving rise to this action occurred in the Southern District of New York.

## THE SUBJECT OF THIS ACTION

18.    As set forth more fully below, OnBoard, a corporate resident of the State of New York, recently learned that for approximately the last year, Defendant has been stealing OnBoard's proprietary data and publishing it on Defendant's website at www.propertymaps.com.

19.    Through screen captures of Defendant's website over the past year, it is clear that Defendant has utilized OnBoard's proprietary content without authorization and/or remuneration to provide the identical information and services to its own customers *at no charge*, and in the

process, upon information and belief, has lured away several of OnBoard's existing and likely customers, who would otherwise have paid OnBoard significant licensing fees therefor.

20.    OnBoard now commences this action against Defendant to recover substantial monies due and owing to OnBoard as a result of Defendant's misappropriation of such proprietary content, confidential information and trade secrets.

21.    OnBoard also seeks a permanent injunction prohibiting Defendant from misappropriating further materials in the future, and the return and/or destruction of all such materials previously misappropriated.   Without injunctive relief, OnBoard will be irreparably harmed.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### OnBoard's Business Model

22.    OnBoard is an innovative business-to-business provider of internet based tools, services, proprietary data and trending information (the "Content") to real estate industry clients to help them and their customers better understand a multitude of factors relevant to the complex real estate market.  Among OnBoard's most sought after Content is its proprietary Neighborhood Navigator, which offers neighborhood demographics, local business and community information, income disparities, home values, recent home sales, schools, weather and crime figures among other categories.

23.    To develop the Content, OnBoard collects data from hundreds of carefully researched and selected sources, and also licenses, at a fee, material from public, private, and governmental databases.   Through proprietary processes, OnBoard then filters the raw data through extensive standardization, quality assurance, geographical processes, projection and

estimation modeling, and aggregation into relevant and integrated content feeds and products for its clientele.

24.     A major part of the proprietary process of editorializing the raw data is performed through a custom designed computer program written and developed by OnBoard.  This includes analyzing raw sales transaction records collected at the local level and applying unique address correction techniques to adjust for errors, and applying further proprietary filters to identify and remove transactions not considered "arms length" (and therefore not useful for determining actual market activity).  As a result, the processed data provided to OnBoard's clients – that is, the Content – is completely distinct from any other provider's data, even when calculated using the same underlying source information (e.g., county records).  Since its founding in 2001, OnBoard has spent well over four million dollars ($4,000,000), and thousands of employee hours, to write, test, revise, refine and otherwise create and continuously update this proprietary computer source code.

25.     Due to the precision of the Content, OnBoard has become the largest data aggregator of its kind in real estate.  Corcoran, the New York Times, Washingtonpost.com, Century21 Real Estate, Coldwell Banker, CNN Money and Prudential Real Estate are among OnBoard's numerous clients, each of which pay substantial licensing fees to OnBoard for the use of the Content.

26.     OnBoard licenses the Content to its customers pursuant to written Content License Agreements ("Agreements") that contain stringent usage and confidentiality provisions.  Among other provisions, no licensee may reproduce, sell, sub-license, create derivative works from, transfer, derive revenue from and/or otherwise use the Content except as expressly set forth in the Agreements.

27.    The Agreements also require that each licensee identify OnBoard as the source of the data on all pages where the Content is displayed or utilized in any manner.  Sample text includes "Neighborhood content provided by On Board LLC", "Information Powered by On Board LLC" and the like.  In addition, licensees must display a copyright notice and disclaimer in the form of, "Copyright © 2008 On Board LLC," on the bottom of all web pages.

28.    Each Agreement is for a minimum term of one year and, unless terminated, automatically renews for an additional one year term subject to a 5% increase.

29.    OnBoard delivers and integrates the Content to each of its licensees by a variety of methods including XML (structured web service content feed), Bulk (batch flat file delivery via file transfer protocol or similar methods) and Navigator (hosted ASP delivery) off of servers that reside in New York City.  Rates for the use of the Content vary from licensee to licensee depending on the Content category (schools, community, etc.), coverage area (state, region, national), delivery method and number of websites licensed.

30.    OnBoard's Content and unique, state-of-the-art, computer source code and software, modeling algorithms, aggregation, quality assurance processes, and proprietary business model and processes comprise its confidential information ("Confidential Information").

31.    OnBoard has always maintained and protected the secrecy of its Confidential Information.

32.    Among other things, as part of its terms of employment, OnBoard expressly notifies all employees that all Confidential Information is proprietary to OnBoard, and that unauthorized copying, use, transmittal or disclosure is strictly prohibited.  OnBoard's written confidentiality agreements with all employees prohibit such unauthorized activities, and require

the return of all Confidential Information upon termination of employment.

33.    OnBoard also safeguards its Confidential Information against unauthorized use or disclosure through state of the art, computer database protected, confidential passwords available only to certain employees on a need-to-know basis.  Among the many features of its security protocols, OnBoard has installed cameras and a key card system in its server rooms, reviews internet traffic reports weekly to monitor data mining and scraping, and allows only two employees access to its proprietary source code.  Furthermore, OnBoard "tags" various attributes of its Content with unique, hidden key values that easily identifies the data as OnBoard's proprietary Content and differentiates it from any competitor's data.

34.    Simply stated, OnBoard's Confidential Information is not available to the general public or to OnBoard's competitors; is subject to protective computerized safeguards and stringent confidentiality, secrecy and non-disclosure requirements among employees, consultants, and clients; has substantial value to OnBoard; cannot be duplicated by OnBoard's competitors without extraordinary effort and expense; would have enormous value to OnBoard's competitors; and provides OnBoard with a distinct, significant competitive advantage, particularly given the unique standardization, quality assurance and geographical processes underlying the creation of the Content.

35.    As such, the Confidential Information constitutes important, protectible trade secrets owned exclusively by OnBoard.

### PropertyMaps' Business Model

36.    PropertyMaps' interactive web site serves as an internet storefront, which allows potential real estate buyers to search, and real estate brokers affiliated with Multiple Listing

Services ("MLS Brokers") to post, map-based real estate listings throughout the United States, including New York State and the five (5) boroughs of New York City.

37.    PropertyMaps also acts as a facilitator between such potential real estate buyers and the MLS Brokers throughout the United States, including New York State and the five (5) boroughs of New York City, by, *inter alia*, receiving inquiries concerning the real estate listings posted by the MLS Brokers from the interested buyers and, in turn, providing the MLS Brokers with the first notice of a lead when a potential buyer requests a callback or a visit to a specific property listed on PropertyMaps' web site.

38.    The MLS Brokers pay a monthly fee to PropertyMaps to partner and provide the real estate listings and local data on PropertyMaps' web site, which is made available to the public at no cost.

39.    PropertyMaps announced on its corporate blog on July 30, 2007 that it had made its first foray into the New York market.

40.    PropertyMaps provides thousands of real estate listings throughout New York State (including the five (5) boroughs of New York City) for which it receives a monthly fee from each MLS Broker.  By way of example, as of the date of this Amended Complaint, PropertyMaps' web site had over 12,500 real estate listings in New York State, which includes 3,572 listings in New York City comprised of 38 in New York County, 1,251 in Brooklyn, 568 in the Bronx, 1,059 in Queens, and 656 in Staten Island.

41.    PropertyMaps has established affiliations with many New York real estate brokers including approximately seventeen (17) New York real estate brokers whose services PropertyMaps' users can access directly through PropertyMaps' web site by "clicking" onto direct links to such brokers.  These services are offered on PropertyMaps' web site under the

heading "New York Real Estate Resources." In exchange for offering these New York brokers'

services on its web site, upon information and belief, PropertyMaps is paid a fee paid by such

brokers.

42.    In addition, PropertyMaps' web site provides an interactive forum or bulletin

board service, referred to as the "Global Village", on which various participants, including New

York residents, discuss real estate issues such as, in the case of the such New York residents, tips

for obtaining down payment assistance from the Nassau County Office of Housing and

Intergovernmental Affairs and Long Island Housing Partnership, New York's real property laws,

renting in New York, and other related matters.

### Dealings with PropertyMaps

43.    In or about April 2006, J. Matthew Beck ("Beck"), President of PropertyMaps,

contacted Greg Jones, Director of Sales for OnBoard, to inquire about licensing the Content.

44.    PropertyMaps, a competitor of OnBoard, provides information and services

related to the real estate industry, such as the Content offered by OnBoard, over the internet.

Unlike OnBoard, however, PropertyMaps provides such information and service at no charge to

all visitors to its website. Instead of charging a fee for use of its real estate information and data,

upon information and belief, PropertyMaps' business model is based on, among other things,

advertising and sponsorship revenue, and fees from its authorized brokers.

45.    Upon information and belief, PropertyMaps regularly transacts business in the

State of New York by providing services to and soliciting business from this State's residents.

46.    Following Beck's initial contact with Greg Jones, a number of e-mails and

telephone calls were exchanged discussing such topics as specific Content available, rates and

charges, and delivery methods.

47.    In response to Beck's inquiries, OnBoard demonstrated its Neighborhood Navigator and showed him samples of the Content displayed on its website and those of some of its licensees. All samples provided to Beck were (and are) clearly marked, "Sample Report" and "Property of ONBOARDLLC.COM," and all examples of Content posted on OnBoard's licensees' websites displayed a copyright notice and disclaimer in the form of, "Copyright © 2008 On Board LLC," as required by contract.

48.    Inquiries continued and on November 30, 2007, OnBoard sent an e-mail to Beck attached to which were a proposal containing content and pricing options, as well as the standard confidentiality agreement that OnBoard requires all potential clients to sign before continuing negotiations for the purchase of a Content license.

49.    Beck never signed the confidentiality agreement and never entered into a Content License Agreement, and all contact between the parties came to a standstill shortly after OnBoard sent its proposal to Beck.

50.    Then, on or about April 18 2008, Melissa Pedersen, OnBoard's Customer Relations Manager, came across a press release from PropertyMaps. Curious about its content, Ms. Pedersen searched PropertyMaps' website where she discovered much of OnBoard's proprietary Content displayed.

51.    To compound matters, PropertyMaps offered the Content *free* to anyone who visited its website.

52.    Among the voluminous misappropriated Content, PropertyMaps posted OnBoard's charts and graphs from its Neighborhood Navigator in the exact same design and layout as created by OnBoard. Not only was the Content displayed without attribution to OnBoard, but PropertyMaps was not even an authorized licensee in the first place.

53.     The discovery of 3Q 2006 Content on PropertyMaps' website in 2008 was a clear indication that PropertyMaps had misappropriated such Content. At the time of Ms. Pedersen's discovery, OnBoard had already revised its Content significantly since 3Q 2006. Among other items, OnBoard updates its property trending and school data each quarter, and updates its community data annually. PropertyMaps, however, was displaying the same 3Q 2006 Content that OnBoard had demonstrated to Beck when he first inquired about obtaining a license from OnBoard. Since OnBoard maintains historical archives of its previously produced Content, it was able to confirm PropertyMaps' misappropriation by comparing the PropertyMaps web pages against Content that OnBoard had provided previously to clients and the Navigator systems.

54.     Furthermore, because OnBoard creates the Content by analyzing, editing and filtering raw data through its proprietary computer program, it is impossible that PropertyMaps could have independently recreated the exact same data on its own for each and every chart and graph, especially when it was identical to OnBoard's outdated 3Q 2006 Content.

55.     By way of example only: (a) set forth on Exhibit A is a chart produced by OnBoard for its Neighborhood Navigator displaying home sales activity in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMaps web page displaying the exact same information in virtually identical form.

(b)     set forth on Exhibit B is a chart produced by OnBoard for its Neighborhood Navigator displaying home sales average/median prices in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMaps web page displaying the exact same information in virtually identical form.

(c)      set forth on Exhibit C is a chart produced by OnBoard for its Neighborhood Navigator displaying population statistics in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMaps web page displaying the exact same information in virtually identical form.

(d)      set forth on Exhibit D is a chart produced by OnBoard for its Neighborhood Navigator displaying temperature in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMaps web page displaying the exact same information in virtually identical form.

(e)      set forth on Exhibit E is a chart produced by OnBoard for its Neighborhood Navigator displaying weather risk in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMaps web page displaying the exact same information in virtually identical form.

(f)      set forth on Exhibit F is a chart produced by OnBoard for its Neighborhood Navigator displaying workforce demographics in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMap web page displaying the exact same information in virtually identical form; and

(g)      set forth on Exhibit G is a chart produced by OnBoard for its Neighborhood Navigator displaying crime statistics in the 02116 zip code (Boston, Massachusetts), which utilized 3Q 2006 Content, and a chart captured from a recently discovered PropertyMaps web page displaying the exact same information in virtually identical form.

56.    Had PropertyMaps acquired a valid license for use of the Content, OnBoard would have charged a fee of no less than $150,000 per annum for such Content. In addition,

PropertyMaps would have been obligated to pay OnBoard a re-syndication fee for each and every third-party website that utilized the Content acquired from PropertyMaps.

57.     Upon information and belief, PropertyMaps, from its Florida offices, misappropriated OnBoard's proprietary Content by either (a) "scraping" the processed data directly from OnBoard's website and/or servers, or one or more of OnBoard's authorized licensees, sometime between November 2006 and May 2007, or (b) copying the Content directly from OnBoard's website and/or servers or one of its licensee's websites and/or servers.  Scraping is a process in which software is programmed to search a particular website page by page, access and lift the data off of it, and then upload the information into a file on the scraper's end that can be downloaded and used in a database, website or any number of other programs and applications.

58.     Upon ascertaining PropertyMaps' outright theft of OnBoard's Content, on or about April 21, 2008, Marc Siden, CEO of OnBoard, telephoned Beck and demanded that he immediately remove all (unlicensed) Content from PropertyMaps' website, cease and desist any other usage of such Content, and compensate OnBoard accordingly for such unauthorized use.

59.     In an e-mail to Beck the next day, Siden repeated, *inter alia*, OnBoard's demands that PropertyMaps remove all infringing Content and compensate OnBoard.

60.     When Siden wrote to Beck that his response, or lack thereof, was unacceptable and contemplated legal action, Beck admitted that, "It only took three months to duplicate your product," and threatened that, "as soon as I receive your notice of suit I'll be sure to release a free API to provide the charts and graphs to all."  A copy of Beck's e-mail is annexed hereto as Exhibit H.

61.    Upon information and belief, PropertyMaps has since removed OnBoard's Content from its website, but has refused to compensate OnBoard for such unauthorized use.

62.    Upon information and belief, as a result of PropertyMaps' providing the Content to its customers without charge, during the period of PropertyMaps' misappropriation, several of OnBoard's clients ceased subscribing to OnBoard's unique services.

63.    In view of PropertyMaps' misappropriation and unauthorized use of the Content, failure to compensate OnBoard therefor (both for the licensing and resyndication fees that would be due to OnBoard), the concomitant luring away of certain of OnBoard's clients, and overt threat to continue such infringing use and divulge such Content to the public at large, OnBoard commenced the instant action seeking a permanent injunction and damages.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

64.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "63" with the same force and effect as if fully set forth herein.

65.    Plaintiff possesses trade secrets in the form of its various Confidential Information, including but not limited to its Content, which are entitled to protection.

66.    Plaintiff's trade secrets and confidential information are known only to certain persons employed by Plaintiff, and are sufficiently secret and difficult to obtain that the Confidential Information has economic value.

67.    Plaintiff's confidential and proprietary business information and documents are not known to its competitors.

68.    Plaintiff's confidential and proprietary business information and documents cannot be duplicated by any of its competitors without a significant expenditure of time, effort

and expense.

69.    Plaintiff goes to great lengths and expense to maintain the confidentiality of its trade secrets and Confidential Information.

70.    Defendant has taken and used these trade secrets as a result of discovery, access, and transmittal by unauthorized, improper means.

71.    Defendant's aforesaid acts constitute intentional and willful misappropriation of trade secrets.

72.    By reason of the foregoing, Defendant is liable to OnBoard in an amount to be determined at trial of this cause of action, but believed to be in excess of $1,000,000, with its costs of this action, and attorneys' fees and interest thereon from April 1, 2006.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unfair Competition)

73.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "72" with the same force and effect as if fully set forth herein.

74.    Defendant has engaged in bad faith by misappropriating and exploiting Plaintiff's Confidential Information without permission and compensation, while avoiding the investment of time, money and resources that Plaintiff has expended in order to develop and promote the Confidential Information.

75.    By misappropriating and exploiting Plaintiff's confidential and proprietary information in a way that it knew or should have known would inflict significant competitive injury upon Plaintiff, Defendant has acted in bad faith and has engaged and is continuing to engage in intentional and willful unfair competition for which Plaintiff has been damaged.

76.    By reason of the foregoing, Defendant is liable to OnBoard in an amount to be

determined at trial of this cause of action, but believed to be in excess of $1,000,000, with its costs of this action, and attorneys' fees and interest thereon from April 1, 2006.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unjust Enrichment)

77.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "76" with the same force and effect as if fully set forth herein.

78.    At all times herein mentioned, Plaintiff was and is the owner of the Confidential Information, including the Content.

79.    Defendant misappropriated Plaintiff's Confidential Information for use in competition with Plaintiff to secure Defendant's own financial gain without making the investment of time, money and resources that Plaintiff has expended in order to develop and promote the Confidential Information.

80.    The Defendant has been unjustly enriched through its intentional and willful misappropriation of the Confidential Information without permission from and payment to Plaintiff.

81.    It would be against equity and good conscience to permit Defendant to retain the benefit of its misappropriation of Plaintiff's Confidential Information without compensation to Plaintiff.

82.    By reason of the foregoing, Defendant is liable to OnBoard in an amount to be determined at trial of this cause of action, but believed to be in excess of $1,000,000, with its costs of this action, and attorneys' fees and interest thereon from April 1, 2006.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Tortious Interference with Business Relations)

83.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through

"82" with the same force and effect as if fully set forth herein.

84.    Plaintiff enjoyed and continues enjoy valuable business relationships with a variety of clients in the real estate industry.

85.    At all relevant times herein, Defendant was fully aware of Plaintiff's business and contractual relationships and expectancies with its clients.

86.    Defendant intentionally and maliciously interfered with Plaintiff's business relationships by misappropriating and using Plaintiff's Confidential Information to unfairly compete with Plaintiff by inducing or causing Plaintiff's clients to terminate their business relationships with Plaintiff for the benefit of Defendant

87.    In doing so, Defendant acted for a wrongful purpose and used dishonest, unfair and improper means to interfere with Plaintiff's business relationships.

88.    As a consequence, Defendant has and continues to cause irreparable injury to Plaintiff's business relationships.

89.    By reason of the foregoing, Defendant is liable to OnBoard in an amount to be determined at trial of this cause of action, but believed to be in excess of $1,000,000, with its costs of this action, and attorneys' fees and interest thereon from April 1, 2006.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Conversion)

90.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "89" with the same force and effect as if fully set forth herein.

91.    Plaintiff has sole, legal ownership of its Confidential Information.

92.    Defendant intentionally and without authority, assumed and exercised dominion and control over the Confidential Information through Defendant's unauthorized use to the

exclusion or in defiance of Plaintiff's rights to such Confidential Information.

93.    Defendant has made no repayment to Plaintiff for its unauthorized use of Plaintiff's Confidential Information, despite repeated demand for payment from Plaintiff.

94.    Defendant's aforesaid acts constitute intentional and willful conversion.

95.    By reason of the foregoing, Defendant is liable to OnBoard in an amount to be determined at trial of this cause of action, but believed to be in excess of $1,000,000, with its costs of this action, and attorneys' fees and interest thereon from April 1, 2006.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Permanent Injunction)

96.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "95" with the same force and effect as if fully set forth herein.

97.    Defendant's unauthorized misappropriation of OnBoard's Confidential Information was willful, wrongful, inequitable and intended to interfere with Plaintiff's rights in the Confidential Information, and Defendant should not benefit from such improper conduct.

98.    Money damages are inadequate to compensate Plaintiff.

99.    Unless enjoined, Defendant's wrongful conduct is likely to recur and will continue to further cause Plaintiff irreparable harm in terms of unjustified damage to its commercial endeavors.

100.    Plaintiff has no adequate remedy at law to prevent Defendant from further misappropriating Plaintiff's Confidential Information.

101.    Plaintiff has a substantial likelihood of success on the merits of this action, and the balancing of the equities in this case favors the Plaintiff.

102.    By reason of the foregoing, Plaintiff is entitled under the equitable powers of this

Court to a permanent injunction enjoining Defendant from misappropriating Plaintiff's Confidential Information, including its Content, without permission and compensation.

103.    Plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff OnBoard respectfully requests that this Court enter a judgment:

(a)    Awarding Plaintiff on its First Cause of Action for Trade Secret Misappropriation its damages and Defendant's profits attributable to Defendant's misappropriations in an amount to be determined at trial, but not less than $1,000,000, together with interest thereon from April 1, 2006, attorney's fees, costs and disbursements of this action;

(b)    Awarding Plaintiff on its Second Cause of Action for Unfair Competition its damages and Defendant's profits attributable to Defendant's misappropriations in an amount to be determined at trial, but not less than $1,000,000, together with interest thereon from April 1, 2006, attorney's fees, costs and disbursements of this action;

(c)    Awarding Plaintiff on its Third Cause of Action for Unjust Enrichment its damages and Defendant's profits attributable to Defendant's misappropriations in an amount to be determined at trial, but not less than $1,000,000, together with interest thereon from April 1, 2006, attorney's fees, costs and disbursements of this action;

(d)    Awarding Plaintiff on its Fourth Cause of Action for Tortious Interference with Business Relations its damages and Defendant's profits attributable to Defendant's misappropriations in an amount to be determined at trial, but not less than $1,000,000, together with interest thereon from April 1, 2006, attorney's fees, costs and disbursements of this action;

(e)    Awarding Plaintiff on its Fifth Cause of Action for Conversion its damages and Defendant's profits attributable to Defendant's misappropriations in an amount to be determined at trial, but not less than $1,000,000, together with interest thereon from April 1, 2006, attorney's

fees, costs and disbursements of this action;

(f)      On its Sixth Cause of Action for a Permanent Injunction: (i)permanently enjoining and restraining Defendant, its officers, agents, servants, sales representatives, distributors, employees, attorneys, customers, prospective customers, and those persons in active concert or participation and those persons otherwise in privity with them,

(a)      from directly or indirectly, in whole or in part, using, disclosing, reproducing, creating derivative works from, selling, offering, advertising, promoting, marketing, distributing, disposing of, licensing, renting, leasing, lending, transferring, or displaying Plaintiff's Confidential Information; and

(b)      from doing any other act constituting trade secret misappropriation, unfair competition, unjust enrichment, conversion or any other legal violations against plaintiff;

(ii)      Ordering Defendant and all those to whom Defendant has provided the Confidential Information, in whole or in part, to:

(a)      download onto documents and computer disks all such Confidential Information, all derivations therefrom, and all related electronic documentation; and

(b)      deliver to Plaintiff's counsel all such documents and disks, and all other copies of Confidential Information, regardless of medium; and

(c)      delete and otherwise remove from computer hard drives and all other electronic storage means in a permanent manner all copies of Confidential Information, and derivations thereof.

(iii)      Ordering Defendant to file with the Court and serve upon Plaintiff's counsel within 30 days after service upon Defendant of this Court's injunction issued in this action, a written report, signed under oath, setting forth in detail the manner in which Defendant has

complied with such injunction; and

(g)    Awarding Plaintiff such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
       July 9, 2008

**LAW OFFICES OF DAVID C. BERG**

By: _____
David C. Berg (DB-4089)
Attorneys for Plaintiff
*OnBoard LLC*
425 Madison Avenue, 11th Floor
New York, New York 10017-1110
(212) 829-0400

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ONBOARD LLC,                                    Case No. 08 civ 5449(AKH)

                              Plaintiff,          ECF Case

         – against –

PROPERTYMAPS, INC.                              **VERIFICATION**

                             Defendant.
-------------------------------------------------------------------X

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NEW YORK    )

        MARC SIDEN, being duly sworn, deposes and says:

        I am the CEO of plaintiff ONBOARD LLC in the above-captioned action, that I have
read the foregoing Amended Verified Complaint and know the contents thereof; that the same is
true to my knowledge, except as to the matters therein stated to be alleged upon information and
belief, and as to those matters I believe them to be true.

                                                     Marc Siden

### ACKNOWLEDGMENT TAKEN IN NEW YORK STATE

        On the 9th day of July in the year 2008, before me, the undersigned, personally appeared,
Marc Siden, personally known to me or proved to me on the basis of satisfactory evidence to be
the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s) or the person upon behalf of which the
individual(s) acted, executed the instrument.

**CHERYL CROUSE**
Notary Public, State of New York
No. 01CR6145034
Qualified in Kings County
Commission Expires: May 01, 2010

                                       Notary Public

Exhibit A

# Zip Code: 02116

o Sales Activity:

### 1. PropertyMaps



### 2. OnBoard



Exhibit B

○ Sales Average/Median:

### 1. PropertyMaps



### 2. OnBoard



Exhibit C

o Population:

### 3. PropertyMaps



### 4. OnBoard



Exhibit D

○ Temperature:

### 1. PropertyMaps



### 2. OnBoard



Exhibit E

○ **Weather Risk:**

### 1. PropertyMaps



### 2. OnBoard



Exhibit F

○ Workforce:

## 1. PropertyMaps



## 2. OnBoard



Exhibit G

o Crime:

## 1. PropertyMaps



## 2. OnBoard



Exhibit H

From: "J. Matthew Beck" <jmbeck@propertymaps.com>
To: "Marc Siden" <marcs@onboardllc.com>
Cc: "Jon Bednarsh" <jonb@onboardllc.com>
Sent: Wednesday, April 23, 2008 12:38:08 PM GMT -05:00 US/Canada Eastern
Subject: Re: Alleged Usage of OnBoard's Data

Marc,

It'll probably be years before we see that trial. Frankly, I'm not intimidated given that all the information has thus far been successfully regenerated from verified sources. Of course we're not in the data providing business. However, considering we're spending so much time and money on this, as soon as I receive your notice of suit I'll be sure to release a free API to provide the charts and graphs to all. Hell, maybe we'll just release the source code as well. If you don't force me to squander additional resources on this minor issue, then I'll refocus our attention on our core business which doesn't include providing data.

The smart move would be to forge a strategic alliance. Given that we're obtaining detailed MLS information nationally, we could work together to take your data products to the next level while making them impossible to reproduce. It only took three months to duplicate your product. However, MLS data is not public or available for sale. You should calm down and think about the opportunity costs here. Considering we didn't use any sites displaying your copyrights, your burden of proof is going to be difficult to say the least. Do you really want to spend $150-300k in the hopes of possibly, definitely not probably, making $150k?

We got off on the wrong foot, but it's not too late to make money together instead of wasting it on frivolous litigation. Sue and you've permanently brunt the bridge and created a new competitor.

Matt